15870

ALLEN v. WESTERN UNION TELEGRAPH CO.
(39 S. E. (2d), 257)

158

*Messrs. Francis R. Stark* and *John H. Waters,* of New York, N. Y., and *Mitchell & Horlbeck,* of Charleston, for Appellant,

*Messrs. Huger Sinkler* and *Charles H. Gibbs,* of Charleston, for Respondent,

September 3, 1946.

Mr. Associate Justice Oxner delivered the unanimous opinion of the Court.

This is an action to recover damages alleged to have been sustained through error in the transmission of a cablegram addressed to respondent. The trial resulted in a verdict for respondent in the sum of $500.00. The sole question for determination is whether the Court below erred in refusing appellant's motion for a directed verdict upon the ground that there was no proof showing that respondent was damaged as a result of appellant's breach of duty in failing to correctly transmit the message mentioned.

Charles R. Allen, the respondent, is an importer and distributor of food products with his principal place of business in the city of Charleston, South Carolina. During 1943, he did a very large business in canned pineapple which he purchased from Cuba and resold to wholesalers in the United States. During that year he imported from Cuba about 80,000 cases of canned pineapple which was approximately 10% of the total Cuban pineapple handled on the American market. At that time, owing to war conditions, no pineapple was being imported from Hawaii and the Philippines, the only other sources of supply.

On October 2, 1943, respondent received a cablegram from the brokerage firm of Tous Astorqui, of Havana, Cuba, offering him 2,000 cases of a certain grade of canned pineapple known as "Tens Topping" at $8.75 per case. Respondent, who was the only witness in the case, testified that upon receipt of this message he conferred with the men in his office, communicated by telephone with the largest buy-

ers, and during the day sold 2,000 cases of this grade of pineapple to Sexton & Company, a Chicago firm, at $10.50 per case. Later in the day he cabled Tous Astorqui an acceptance of the offer made by that firm.

About a week later, respondent received by mail from Tous Astorqui a written contract covering the purchase which he had made, in which the price was stated to be $9.75 per case. He immediately telephoned the seller and called attention to the discrepancy between the price stated in the cablegram and that contained in the contract and it then developed that the message as delivered to appellant in Havana quoted the price of this pineapple at $9.75 per case, or a dollar a case above that quoted in the cablegram as delivered to respondent. Respondent stated that at this time the supply of pineapple on the market was less than usual, that "the important thing was to get the merchandise", and that being unable to purchase this pineapple elsewhere for less than $9.75 per case, he paid that price for the 2,000 cases which he had bought.

Respondent further testified that several days prior to the receipt of the telegram mentioned, he had purchased canned pineapple at $8.75 per case; that the ceiling price at which he could sell under the Government regulations was $11.25 per case; that he did not undertake to secure the ceiling price, but always followed the policy of selling at a "mark up" of ten to twelve per cent.; that in selling the 2,000 cases to the Chicago firm on October 2nd, he thought he was re-offering the pineapple at approximately a twelve per cent. "mark up"; that he definitely would not have sold this pineapple at $10.50 per case if he had known that it was costing him $9.75 per case; that in addition to the invoice price at which he purchased, he had to pay insurance, duty, and other charges; that after paying these charges on the 2,000 cases bought and sold on October 2nd, he only realized a profit, without making any allowance for overhead, of $170-.00 on the entire transaction, which was considerably less than that always received; and that the price at which he

sold the Chicago firm was not the best he could have secured, but he "tried to stand within the ten to twelve profit range".

There was offered in evidence a "daily sales book" in which respondent kept a daily record of sales and purchases. Some of the entries in this record, as well as certain oral testimony of respondent which appellant claims was stricken out by the trial Judge, will be later referred to.

■ Appellant's counsel state that "no out-of-pocket loss resulted from the transaction". But it is now well established that loss of profits, when not too uncertain or speculative and where "the circumstances or the terms of the message were such as to impart notice that such loss might result from the telegraph company's default", may be recovered "if the loss was the proximate consequence of the company's negligent act, and was, or should have been, contemplated as probable or likely to follow the negligence". 52 Am. Jur., page 162, section 133. As observed by Mr. Justice Woods in *Bowie v. Telegraph Co.,* 78 S. C., 424, 59 S. E., 65, "the parties are entitled to all legitimate benefits of the contract, including profits".

In *Hays v. Western Union Telegraph Co.,* 70 S. C., 16, 48 S. E., 608, 67 L. R. A., 481, 106 Am. St. Reports 731, the plaintiffs, dealers in horses and mules, received a telegram in which mules of a certain size were erroneously quoted at $107.50 each when the correct quotation was $117.50. Plaintiffs testified that on the faith of the telegram, they were induced to buy twenty-four mules of the size stated for which they had to pay $117.50, when but for the mistake in the telegram, they would not have purchased mules of this size, but could, and would, have purchased smaller mules at a price about $10.00 lower, which would have answered the same purpose in the conduct of their business and which could have been resold for as much as the larger mules. The Court there said: "Whether we regard the effect on the plaintiffs as a loss of profit, or the fruitless

expenditure of money on the faith of the telegram, the result is the same. The difference in the price paid and the price stated in the telegram as delivered was, under the facts of this case, the true measure of damages". The Court upheld a verdict for the plaintiffs in the sum of $240.00.

In *Bowie v. Western Union Telegraph Co., supra* (78 S. C., 424, 59 S. E., 65), there was delivered to the plaintiff, a wholesale grocer and commission merchant, a telegram offering flour for sale at $4.30 a barrel. In reliance upon the message, plaintiff purchased from the sender of the telegram 300 barrels. On the faith of his trade, plaintiff immediately resold the flour at $4.40, which represented a profit of ten cents per barrel on the price stated in the telegram as delivered. When the flour arrived, the plaintiff found that the seller had drawn a draft, with the bill of lading attached, in which the price was computed at $4.60 a barrel, instead of $4.30 as stated in the telegram received. It then appeared that the price quoted in the telegram was changed in transmission from $4.60 to $4.30. The plaintiff paid the draft and delivered the flour on his contracts of sale. There was no evidence that the plaintiff could have obtained for delivery on his contracts flour at a price less than the sum called for by the draft which he was obliged to pay in order to obtain the flour. The plaintiff claimed that he had been misled and damaged $90.00 by reason of the defendant's negligence in changing the offer in transmission. The Court held that under the facts of that case, "the difference between the price as stated in the telegram and the price plaintiff was obliged to pay is the true measure of damages", and allowed recovery in the sum of $90.00.

In *T. P. Sims & Sons v. Western Union Telegraph Co.,* 89 S. C., 237, 71 S. E., 783, the telegram, as delivered to the plaintiffs, contained an offer to sell flour at $5.00 per barrel when the flour should have been quoted at $5.50 per barrel. Plaintiffs accepted the offer and purchased 150 barrels. Supposing that they were buying at $5.00 per barrel, plaintiffs on the same day resold the flour at $5.50 per bar-

rel. The error in the message was discovered a few days later. The flour was not shipped and plaintiffs were compelled to buy the flour at $5.90 per barrel in order to fulfill their contract of resale. The Court held that the defendant was liable for an amount equal to the difference between the price stated in the telegram as delivered to the plaintiffs and the price stated in the telegram as delivered to the defendant for transmission, and permitted recovery in the sum of $75.00.

We do not think that the Court intended in the foregoing cases to lay down a fixed or inflexible rule that under all circumstances where a telegraph company makes an error in transmitting the quoted price of a commodity by naming a price lower than that stated in the telegram as delivered to it for transmission, the measure of damages in an action by the addressee, who buys in reliance upon the offer contained in the telegram as received by him, is the difference between such price and the price which he is compelled to pay. In some instances the true measure of damages may be less than the amount of such difference and the circumstances may be such in others that the addressee sustains no damages. The subject under consideration is annotated in Ann. Cas., 1912-C, page 1279, and 46 L. R. A. (N. S.), page 412. The three South Carolina cases mentioned are referred to in these annotations. As stated in *Bowie v. Telegraph Co., supra* (78 S. C., 424, 59 S. E., 65) : "To lay down any formula by which damages may be measured in all cases for failure to deliver telegrams or mistakes in their transmission is impossible. The direct damages to be anticipated, as well as those which are actually produced by such failures and mistakes, are as various as the business affairs which are transacted by telegraph".

■ Under the circumstances of this particular case, we think that the correct measure of damages is the difference, if any, between the price at which respondent was induced by the error in the cablegram to sell on October 2nd and the

price at which he could, and would, have sold said pineapple had the message been correctly transcribed.

In *Hind et al. v. Western Union Telegraph Co.* (C. C. A., 9th Circuit), 278 F., 730, a case strongly relied on by appellant, the plaintiffs were grain merchants at San Francisco. They had barley to sell. A cablegram was sent to them from London submitting an offer to purchase the barley at a certain price, "including war risk", meaning thereby that the sellers would pay such insurance. The message was changed in transmission by defendant so as not to require the plaintiffs to pay the war risk insurance. The plaintiffs accepted the offer as it came to them, shipped the barley and received the purchase price. Later plaintiffs were compelled to pay the insurance in accordance with the terms of the actual offer and brought suit to recover the amount paid for insurance. It was undisputed that the plaintiffs received a profit on the transaction and that at the time of the sale could not have sold the barley at a higher price than that actually received. The Court held that the plaintiffs had failed to show any damage resulting from defendant's error. However, the Court stated: "They (the plaintiffs) were damaged if they could show that they could have sold the barley at a price higher than that which they received; otherwise not".

■ Has the respondent shown that he could have sold this pineapple on October 2nd at a price higher than that which he received? We quote the following from the redirect examination of respondent:

"Q. Do you know, from your own transactions, about the time of the receipt of this message, that you could have sold that pineapple in excess of the price at which you sold it to Sexton & Company?

"Mr. Horlbeck: We would like to object to that on the ground that it calls for a mere opinion or conclusion of the witness, and would not be competent.

"The Court: I think that line of examination would be relevant now, provided this witness can give evidence along

that line. In response to your cross examination of the witness, I think it is competent to ask him what he could have done.

"A. My definite opinion is that we could have sold it up to the level of the ceiling. As I stated, the OPA Ceiling—

"Mr. Horlbeck: We would like to renew our objection. It is a mere opinion, without being based on any sales, and is incompetent.

"The Court: You are not basing that on any sales you have?

"The Witness: I knew my ceiling was $11.25, and subsequent to that—

"The Court: How subsequent?

"The Witness: I know that in November and December, we sold considerable pineapple at $11.25—

"The Court: I don't think you better—I am going to strike out that last part, since he had no dealings at that time. Gentlemen of the jury, you will disregard that; you are not to consider it in any way in the disposal of this case."

Appellant's counsel construe the ruling of the trial Judge as striking out respondent's answer that he could have sold this pineapple "up to the level of the ceiling". We do not agree with this construction, and the remarks of the trial Judge in his order refusing the motion for a new trial indicate that he thought this testimony was left in the record. The testimony immediately preceding that quoted related to an entirely different phase of the case. When the trial Judge stated that he was striking out "that last part", we think he had reference to the price at which respondent sold in November and December. He probably concluded that sales during those months were too remote in point of time. (The trial Judge subsequently changed his mind, opened up the case, and permitted respondent to show sales in October and November at $11.00 per case.)

■ Respondent was thoroughly familiar with the pineapple market, having handled during 1943 approximately 10% of all Cuban pineapple sold on the American market. We think

he was well qualified to express an opinion as to the price at which he could have sold this pineapple on October 2nd even though no sales were made on that particular day. The question asked was, in effect, an inquiry as to the market value on that date. There was no error in admitting this testimony. *Aldrich v. Southern Railway Co.*, 95 S. C., 427, 79 S. E., 316.

We need not determine the question of whether, apart from the testimony just referred to, the respondent made out a *prima facie* case of damages measured by his usual profits, less those actually received, on the assumption that if the price had been correctly stated, he could have resold at his usual mark-up. In the *Bowie case, supra* (78 S. C., 424, 59 S. E., 65), it will be observed that the plaintiff was not only allowed to recover his out-of-pocket loss of 20¢ a barrel on the flour but also a profit of 10¢ a barrel, although it does not appear from the opinion that there was any evidence that the plaintiff in that case could have resold the flour at an advance of 10¢ a barrel over the real price. See the comments on this case in the annotation found in 46 L. R. A. (N. S.), at page 415.

■ Appellant says that the "daily sales book" kept by respondent shows that the sale to Sexton & Company of Chicago was made on October 1st, the day before the cablegram in controversy was received, and that, therefore, respondent could not have been misled by the cablegram in making the sale. Respondent was positive in his oral testimony that this sale was made on October 2nd and in reliance upon the cablegram received on that day, and stated that he had an invoice from Sexton & Company showing the confirmation. Appellant did not ask him to produce the invoice. We think this apparent conflict between respondent's oral testimony and that of the above record presented an issue to be determined by the jury. It is conceded by appellant that this record is inaccurate in at least one particular, for it gives the date of the purchase of the 2,000 cases

from Cuba as October 5th, when it is undisputed that this transaction occurred on October 2nd.

■ Finally, it is argued that respondent discovered the error in the cablegram on October 9th or 10th and thereafter on October 18th, according to the "daily sales book", made sales aggregating 1,500 cases at $10.50 per case, or the same price at which he sold to Sexton & Company on October 2nd. Appellant contends that this conclusively shows that respondent could not have sold the pineapple at a higher price than that received from Sexton & Company. This same record shows that a total of 1,400 cases of canned pineapple was sold by respondent on October 18th at $11.00 per case and that no sales after October 18th were made by respondent at a price as low as $10.50 per case. Respondent testified that the pineapple sold at $11.00 a case was purchased at $9.75 per case. He also testified that several days prior to October 2nd, he was not paying more than $8.75 for canned pineapple. We think the jury could have reasonably inferred that the sales on October 18th at $10.50 a case represented pineapple which respondent had previously purchased at $8.75 a case. Respondent was positive in his testimony that he did not follow the policy of selling at the best price obtainable but pursued the practice of selling at a certain mark-up on the purchase price.

■ Respondent sought to recover damages in the sum of $1,500.00. It appears that the cablegram in question was received for transmission at the unrepeated-message rate. For this reason, respondent conceded that under the stipulation contained in the contract, the liability of appellant could not exceed $500.00, and the Court so instructed the jury. We, therefore, need not pass upon the amount of damages in excess of $500.00 which might have been recovered except for the limitation mentioned.

Judgment affirmed.

Mr. Chief Justice Baker and Messrs. Associate Justices Fishburne, Stukes and Taylor concur.